One case this afternoon, the last of the five we have for today, is number 13-4079 American Farm Bureau Federation et al. v. United States Environmental Protection Agency et al. And we have with us today Mr. Schwartz. Yes, Your Honor. Mr. Gunther. Mr. Pomeroy. Mr. Hahn. And Mr. Mueller. Judge, if it would be all right, I would like to reserve five minutes for rebuttal. May it please the court, my name is Richard Schwartz. I'm an environmental and construction organizations that have made, in fact, substantial reductions in their discharges to the Bay watershed, and expect to continue to do so. But this case is about which sections of the Clean Water Act will govern those reductions, and the allocations that will be made, the stringency test that will be applied to them, and the keep in mind that this is a long-term program. The EPA has allowed 15 years just to put these latest measures in place. It will take time for them to actually have an effect, and once they do, the water quality will have to be maintained in the Bay. So we're talking about a program that's going to be lasting for many, many decades. My understanding is, I mean, does anybody disagree that the Bay has had, over the course of the last several decades, serious environmental problems? Yeah, we don't disagree with that at all, Your Honor. We do point out that there has been a reduction in the discharges to the Bay, and also that there's a long time for those reductions to show up in the Bay, particularly for the non-point source discharges, because they happen on land. It's a result of what happens on land, and it takes a long time for that to work through to get to the Bay. Now, essentially, my understanding is that any of the states that touch on the Bay or estuaries of the Bay are not joining your position. Is that correct? Well, they're not opposing it either. They haven't sued. I thought some states like Delaware, Maryland, and whatnot were, in effect, in support of the total maximum bailey loads that are currently in place. They filed in support of what EPA did. Now, the state of West Virginia did not. They filed in opposition. Pennsylvania did not. Yeah, that's correct. They were silent. Yeah, they were silent. The other point about this is that the Chesapeake Bay TMDL is not an agreement between the states and EPA. There are agreements that are part of the Chesapeake Bay program, but this one isn't part of them. This is an action by the federal government, which EPA made very clear, and Sean Garvin, the regional administrator, said to the states, there's nothing here for a vote. This is our program. The cases that appear to, at some point, to argue in your favor, Swank and Rampanos, they entrust state sand pit, or gravel pit, entrust state wetland. This is the Chesapeake Bay. Yeah, this is dealing with an entirely different issue. We're not claiming that there's no federal jurisdiction over the Chesapeake Bay, because there obviously is. What we're talking about is the authority for particular aspects of the Bay program. The EPA took what's designated as a total maximum daily load, and they added allocations, reasonable assurance requirements, and deadlines. The point we're making is that Congress took those precise provisions, which were precisely laid out for these waters, and gave them to the states without an EPA override. Go ahead, Jane. Please go ahead. If the states should decide that they, hypothetically, that they want to cooperate with EPA in the implementation of these HDMLs, do you have any objection to that? If they want to vote, no. In fact, the program is set up to do that, and we don't have an objection to that. What we're objecting to is EPA taking over ultimate control authority, which Congress gave to the states. If the states want to cede, to the extent they have authority, if the states want to cede that authority to EPA, do you have any objection to that? Yes, we do. First of all, they haven't done that here. This isn't a question of the TMDL, this is federal. Hypothetically. Yes, in the hypothetical, and the answer is the cases are very clear that even if the states wanted to, they couldn't give that authority to EPA because only Congress can do that. Well, then what about the Chesapeake Bay Agreement, where EPA and the states are to work together to accomplish certain goals in the Chesapeake Bay area? Again, we have no objection to that either. In fact, what we're really saying is that the elements we're objecting to in the TMDL are actually properly part of the Chesapeake Bay program and agreement. They just don't belong in the federal TMDL. Because that changes, that has consequences. It gives EPA ultimate authority over decisions that Congress specifically gave to the states. It authorizes the test that applies to nine point sources. You're saying that the states cannot yield to EPA in the implementation of the Chesapeake Bay Agreement their particular state's rights in connection with the agreement? I'm sorry, just the way that we put it is that EPA gets all of its authority from Congress, and so if EPA takes actions that Congress did not authorize, the states can't confer authority that Congress denied, and that's the point. We're not objecting to cooperation. We think cooperation is terrific, and cooperation will continue just as effectively if you take the allocations, reasonable assurance, and deadlines and put them into the proper programs that Congress designated for this, as opposed to the federal TMDL, which does not, we don't think reasonably can be read to include these kinds of elements. And if in fact the statute is ambiguous to some extent, then of course we're under Chevron deference to a great degree. Would you agree with that? If it is ambiguous about this question, of course we don't think it is. No, I understand. Maybe you could tell us a little bit, tell us why the load allocation as opposed to the waste load allocation is just not covered in this circumstance, either under the statute or under the interpretation of the regulation by EPA. Well, the load allocation, which is for non-point sources, that's covered by sections 319 and 208 of the statute, and that authority is given explicitly to the states. In section 319, Congress instructed the states to develop a comprehensive plan for non-point sources, including identifying the routers that are in fact impaired due to non-point source discharges, identifying the categories and even the specific non-point sources that are responsible for that impairment. Developing to the maximum extent practicable the bus management practices that they must apply. So the Ninth Circuit got it wrong and promptly wrong when they evaluated this authority? Well, they weren't dealing with precisely this question. No, I realize that, but they were certainly dealing with load allocations. They weren't dealing with waste load allocations. There were four different items that involved erosion and discharge that were not waste, but it didn't seem to bother them too much. Again, the question was not put to them. The question there was whether the TMDL could apply at all where non-point sources, only non-point sources were the source of the contamination, and part of the argument was if you look at section 303, the identification of waters applies to waters for which technology-based standards will not achieve the water quality standard. And so the point was made that if there are no point sources on a particular water, it doesn't look like that was what TMDLs were intended to cover. And the court held, well, there's no exception in the statute for waters that only have non-point sources, and so the Ponsalino Court didn't leave that exception into the statute. We're raising a completely different issue, which is... Well, it's not completely different. Isn't it instructive to us to consider that the Ninth Circuit determined that WLAs can be incorporated in the HTML... TMDLs. TMDLs, in spite of what the statute says. I understand your position is that only in the TMDL can you incorporate things within the power of what Congress has given to EPA, but the Ninth Circuit in Ponsalino took that a step further and said you've got to consider the whole gamut of what pollutes water, and that includes non-point source pollution, which is not within the purview of EPA. Yeah, the Ninth Circuit wasn't confronted with a conflict that the issue we're dealing with raises. In other words, the Ninth Circuit said a TMDL can cover a water, whether it's polluted by point sources or non-point sources, that's absolutely true. But it wasn't confronted with a conflict where Congress specifically gave, in Sections 319 and 208, to the states for these very same waters. In 319, it called them waters impaired by non-point sources. In Section 208, it called them areas that had water quality problems, and it gave very specific prescriptions about what should be done and how it should be done. And what EPA is doing, by augmenting the TMDL, is lowering those requirements superfluous, because with EPA's definition of a TMDL, that supplants those very complicated state provisions. And if you compare them, it's... Why doesn't it complement? Excuse me? Why doesn't it complement those provisions? Because it changes a couple of things. It changes the authority as to who decides. It overrides the test. In Section 208 and 319, there were specific tests, particularly for non-point sources, as to what the requirements would be. In 319, it was, to the maximum extent, practicable. In Section 208, it was, to the extent, feasible. And, in fact, in Section 208, they specifically mentioned land use requirements. And those, along with that mention, it fits the fact that those were intended to be given to the states. How would your interpretation be any different if the statute talked about maximum daily load, instead of total maximum daily load? Well, it would be... The total is better for us, obviously, because a total is a single number. It's a final number. I think it would be the same, frankly, because I think in both cases, for our purposes, the point is that you're talking about a load or a level, and those things just don't describe allocations, reasonable assurance, and deadlines. But if you have... If you say that they're the same and you put yourself in our position where you try not to have superfluous words, doesn't total, in effect, then mean it's an add-on? It's an aggregate of maximum daily loads that come from other components? Well, in fact, the aggregate is still... It still leads you to the same conclusion, that you're talking about a single number. And it's not... These other subjects are simply not covered within the description of a total or a load or a level. Is the word total used in any other provision of the EPA? I'm just not sure, Your Honor. The only one I can think of, it does say in 204B, which is at 33 U.S.C. 1284B1, that it talks about total waste water loading of publicly owned treatment works, the constituent elements of the waste, and other appreciable factors. And it would seem that that's what it's doing. It's aggregating. So if maximum daily load adds the word total, it would seem that you need to do some adding up of things that otherwise would be considered. In this case, it would be from non-point sources as well as point sources in order to get your total maximum daily load of what can go into the bag. I think, actually, I would say it's the kind of reverse, that the total is the starting point. Because what you're doing is you're implementing water quality standards almost totally. They involve concentration-based limits. In other words, it's milligrams per liter, because the quality of the water is the percentage of things in the water. And so the next step is to figure out, well, for this particular water, how much stuff can we put in the water and still meet that concentration-based limit? And so to do that... And that stuff can come from either point sources or non-point sources. Oil can come from background, and a lot of it does. And in the case of the Bay, 30% of the nitrogen comes from air deposition. So the idea is that you have a water quality standard, which 90% of the time or more is a concentration limit. The next step is to figure out, okay, how much, if you're not moving it, how much could actually, of whatever the parameter is, it could be nitrogen, it could be zinc, it could be solids, it could be anything, how much can go into the water and still meet that concentration? That's the second step. And then the third step is, okay, we've got, this is the load, so how much can we do nothing about because it's background, it's coming in from rainwater or things we can't control. Of the stuff we can do something about, where is it coming from? Is it coming from point source discharges, in which case we control it through NPDES direct discharge permit limits, or non-point sources, in which case the controls come from the state programs for best management practices that Congress enacted and didn't enact them, it required them in sections 319 and 208. So I follow your thought that the EPA can only deal with point sources, is that right? To, as a general matter, yes, as a generalization. And as a generalization, only the states can deal with non-point sources? Yeah, that's correct. Now there is some overlap, I don't want to overstate this. You're talking about all these things going in, some of which come from this, some from that, and some from the general background. How can you have a coherent policy if we follow the path that you're suggesting? Because all those steps, those calculations have to occur, but that doesn't mean that they occur through a federal requirement. In fact, again, Congress specifically requires them to occur through these other sections. So we're not saying that you aren't going to do this. In fact, we think obviously it does have to be done. The question is which sections of the Act are the ones that govern the way this is done. No, no, so it would make, under your view, it would make it much more difficult for the EPA to coordinate and supervise and integrate all of these various functions. Am I correct in that? I don't think so, Your Honor. In fact, if you look, there are two things. You look at Section 208, which deals with interstate issues and commands the governors of the states to develop a single representative to get together to make these kinds of decisions. And you look at the Chesapeake Bay Program, that's what they did. I think the fallacy is that the only way this can happen is if you cram these things into Section 303D2D1C of the Act. And in fact, this has been happening since 1985 with reductions that have continued to occur, and they haven't met the goal line yet. But under the TMDA, they won't meet the goal line for probably decades. Well, you raise an objection to the application to the upstream states, particularly those that don't border onto the Chesapeake Bay. Actually, in this case, we have not. And in fact, in no case would we. We would quarrel with how it was done, but we're not saying that the upstream states cannot be regulated in order to protect downstream waters. On the load allocations as well. Yes, yes, on both. So the point is that all these functions can be done. We're not at all disputing that. But when you put them into what we believe is the wrong section of the Act, there are consequences that affect us as well as the states. Well, tell us those consequences, because I'm having difficulty seeing the burden that you're talking about. I understand your statutory arguments on this, but what is the actual burden that would be on the states that are affected on the load allocation, the non-point source? You're actually invoking the burdens on us. I understand. And there are basically three consequences. One is the test that will be applied to those non-point source reductions. Under Section 319, it's to the maximum extent practical. Under 208, it's to the extent feasible. The other is, and it really relates to the kind of long-term nature of this plan. If I'm a farmer or developer and I either have an allocation or want an allocation or want to change my allocation, under our view, I would have to go to the state, and the state would have to modify its plan in order to provide that relief if it wanted to. It doesn't have to, but it could. Under the view that EPA has adopted, I could go to the state and they would say, sorry, we can't help you. The only entity that can change this is EPA. So what you're concerned with in that situation is you think you have more clout with the state than you do with the EPA. Well, perhaps so, but the Congress wasn't obviously thinking about our clout. What it was thinking about is decisions that affect local land use and very sensitive local decisions about how burdens will be spread and getting them to the local government entities. So if there is a target date for certain types of pollution and the EPA then sets for point sources and the states slow walk, if you will, for non-point sources and you don't meet those goals by the target dates, there's nothing you can do? There's nothing they can do? Well, the EPA does have remedies in the act. The Ponsalino Court called them carrots and sticks. If they don't apply the TMDL, they can take away the point source discharge program under Section 303. They can take away grant funding. And as the district court in Ponsalino recognized, that is not a minor whip to hold because the states depend on the grant funding, and EPA has tremendous leverage. This would be a basis for taking that away. All right, we have no other questions, but we'll get you back in rebuttal then. Okay. Thank you. Mr. Gunther. Good afternoon, Your Honors. David Gunther from the Department of Justice here on behalf of the United States. I'll argue for 14 minutes, and then my colleagues at counsel's table representing interveners will split the remainder of the time. I have two goals for today's argument. First, I want to address exactly what EPA did in the Bay TMDL to show that states still have ultimate control over the controls that will be imposed on point sources and non-point sources within their jurisdiction, and to clear up the record about the role of reasonable assurances and what that means in the Bay TMDL. My other goal is to explain how the Bay TMDL is grounded in EPA's authority to administer and interpret the act as Congress has delegated to it the authority to do, in particular, to coordinate the cleanup of large multi-state watersheds. Let me turn first, though, to the question of what exactly the Bay TMDL is and what it does. The TMDL is a plan. It's a plan to restore water quality in the Bay. It's a plan to help actors who are writing point source permits, state legislatures trying to decide what controls to impose on sources in their states. It's a plan to help those actors understand how their actions will affect water quality in the Bay and how they'll be coordinated with the other actors in the system. EPA's job, because the states failed to do it, is to establish a TMDL, and the act defines the TMDL not by the form that it takes, but by its function and purpose. It has to be set at a level necessary to implement the applicable water quality standards. So in order to do that job, EPA has to look ahead at how the water quality standards may be implemented, what is feasible in terms of control, and what controls may result in the achievement of water quality standards in the Bay. And what EPA has found, starting in its 1985 regulations interpreting Section 303, which have been upheld over and over again by the courts, is that it's essential to include allocations in order to achieve that function. EPA said in 1985, it's impossible to evaluate whether a TMDL is technically sound and whether it will be able to achieve water quality standards without evaluating component allocations. And so that's what the Bay TMDL does. The allocations don't impose any controls on any source. What they do is give actors within the system an understanding of how much pollution from a particular group of sources, maybe thousands of sources in the case of a large segment like the Susquehanna main stem, how pollution from those sources will affect downstream water quality in the Bay. But under the Act, as I mentioned, states impose those controls in the first instance. So how does EPA assure the public and establish a basis that its decision is reasonable and that its TMDL will meet the statutory mission of implementing the applicable water qualities? Let's assume for the moment that you don't meet it. You've said that you won't undertake any enforcement actions under the TMDL. So is it that you cannot or you've chosen not to do so? Well, let me parse your question. We have not said that we won't take any enforcement actions. We have said that if we take enforcement actions, they won't be under the TMDL. As Mr. Schwartz mentioned, EPA has other tools under the Act. It's Enforcement Authority. To incentivize. I'm sorry? To, in effect, incentivize, if you follow the prosimino case. That's right. And another example is Shantytown Limited Associates, the Fourth Circuit case in which the court said EPA can use its grant-making authority to affect how states and municipalities place controls on non-point sources. EPA is allowed to use those tools. But if EPA does use those tools in the future, it will be on a separate administrative record and subject to separate judicial review. The TMDL is not the basis for that authority, and EPA is not assuming any authority in the TMDL that it doesn't already have under other sections of the Act. So really what the plaintiffs are saying is that by pointing out in the TMDL that EPA may in the future take some actions to help implement water quality standards, EPA is invalidating its present action in the TMDL, and there's simply no authority for that. Instead, what Reasonable Assurances does is it creates an administrative record so that when our colleagues in the environmental community, like Chesapeake Bay Foundation, are considering litigation, or when EPA is forced to defend its decisions in front of a court under the APA, it has an administrative record. It can say, look, we did the math on this, we aggregated this out, and we can demonstrate that this TMDL is adequate to implement the applicable water quality standards. I think that Judge Ambrose, in his question, introduced the idea that the word total introduces this concept of aggregation, and that is the way that EPA interprets the ambiguous phrase total maximum daily load. Maximum daily load on its own could be a single number. Total, though, doesn't have one single definition. Maybe it means just the bottom line, but maybe it means a sum of constituent parts. And in EPA's regulations, which have now been in place for 30 years, that's how EPA did define it as the sum of constituent parts, waste load allocations, load allocation, and a margin of safety. And that's what EPA considers to be necessary in order to determine whether a TMDL will meet its statutory mission. Let me also make sure that I address Section 319. I mentioned to your opposing counsel that I found one place, actually I think I found another where the word total was used, and it's in the Water Resources Reform and Development Act of 2014. Section 2102 requires the EPA to consider the, quote, total quantity of commerce, close quote, supported by a given body of water. And I would have asked him, isn't that really just an aggregate, an adding up? And if it's done there and it's done in the other provision that I asked him about, it also seemed as if that was in 204B1, that was an adding up. Is the word total used anywhere else in the Act? Not that I'm aware of. And, in fact, I hadn't considered that particular application of the word total before I stood up. So I'm not sure whether I would even say that total there means the same as total in Section 303. What you have to look at for purposes of Chevron and in finding an ambiguity is not just the word total, it's the statutory context. And so in Section 303, that context comes not only from the words total maximum daily load, but also the rest of the sentence set at a level necessary to implement the applicable water quality standards. I would also look not just at where the word total is used elsewhere in the Act, but where the words waste load allocation are used elsewhere in the Act. So in Section 303D4, I believe, Congress used the existing regulatory concept of waste load allocation. EPA promulgated regulations in 1985 using that concept. And when Congress amended the Act in 1987, it carried that concept forward into the actual statutory text. So the background against which Congress was legislating in 1987 suggests that Congress understood the way EPA was applying these rules. And the same in Section 319 also was part of those 1987 amendments. And let me just talk about Section 319 for a moment. It's not just about state control of non-point sources. It's about state planning for control of non-point sources. In each of the other sections of the Act that the plaintiffs mention when they say that states have exclusive control over non-point sources, what the Act is really concerned about is planning. That's area-wide waste management plans under Section 208, non-point source management plans under Section 319, the continuous planning process under Section 303E. You have, what, seven states that touch on the Bay? Yes, six in the District of Columbia. In the District of Columbia. What would happen if you set a TMDL at X and two or three of the states just say, we're not going to go along, we're not going to cooperate, and we don't think you're right? What happens then? Let me start by what doesn't happen then. EPA doesn't sue to enforce the TMDL itself. The TMDL is not a regulation. It doesn't, for example, give rise to citizen suits. Instead, EPA would say the states are not implementing this TMDL at a level adequate to achieve water quality standards, and so we will need to use some of our other authorities under the Act. Those are listed in, I believe, Section 7 of the TMDL, like grant-making authority, which Mr. Schwartz said is an incentive for the states. It could increase its enforcement efforts against point-source polluters in the watershed, for instance. It could reclassify some load allocations, which it does not have direct control over, to waste-load allocations, which it can control with point-source permits. But the reason EPA engaged in this long and complicated and inclusive process Let me ask you something. The backstop adjustments, would they be possible in the situation, too, where a state says, well, we just don't agree with what you have in your TMDL and have inadequate planning in the waters of those states? Is that when EPA can step in and say, all right, you won't do it, we're doing it for you? No, actually, and thank you, because this may be helpful to clarify. The backstop adjustments came into play during the development of the TMDL. The states submitted their Phase I watershed implementation plans, which proposed their own allocations. And EPA adopted almost all of those allocations, with only three exceptions. And those exceptions became the backstop adjustments. But the backstop adjustments were incorporated into the TMDL and the allocations itself. And now that the TMDL is established, there's no further role for the backstop adjustments. I think that we were talking about a situation in which the TMDL, once established, states simply refuse to go along with it. And in that case, there's no role for backstop adjustments. Then it's simply time for EPA to use its other authorities under the Act, if necessary, to create a situation in which water quality standards can be achieved. There's one – I'm sorry. Yes. Take us through your analysis of the statutory authority here and the reason why we're in Chevron deference. In EPA's view, the term total maximum daily load is an ambiguous term. It's not defined in the statute. Just the lack of a definition alone doesn't make it ambiguous, but the whole statutory context makes it ambiguous. Congress had a purpose in mind when it enacted the Clean Water Act, and it put EPA at the head of efforts to achieve that purpose. In Section 501 of the Act, it gave EPA explicit regulatory authority to promulgate regulations for the administrator to carry out her functions under the Act. And one of those functions is the approval of state-proposed TMDLs or the establishment of TMDLs in the absence of any state proposal. So that, to us, is an explicit delegation of authority to EPA to make rules to explain how TMDLs will be developed and what criteria are necessary for them to be approved. And EPA determined that allocations are an absolutely necessary criteria for a TMDL to be approved. So then the question is, under Chevron, did Congress specifically foreclose EPA's interpretation? Did Congress address the precise question at issue? And I don't think you can look at the Act and conclude that Congress had a specific intent with respect to whether allocations would be allowed and that that intent would be that they should not be allowed. Instead, I think that the Clean Water Act, like the Clean Air Act that the Supreme Court interpreted last year in UARG, a utility regulatory group, is a complex technical statute that Congress necessarily delegates to EPA to determine exactly what the contours of that are going to be. And so the allocations that EPA included in the TMDL are a part of those contours, whether they are imposed on the states when the state is establishing a TMDL or whether EPA is following its own rules, as it did here when it's establishing the Bay TMDL. Likewise, with reasonable assurance, if EPA is approving a state TMDL, it wants information in the administrative record to support the idea that the state TMDL is adequate. Yeah, I'm sorry. You may finish. Oh, and if EPA is establishing its own TMDL, it has to have reasonable assurance in its own record to demonstrate that its decision is not arbitrary and capricious. What about on the reasonable assurance issue? What do we make of the 2,000 rejection of the rule by Congress? I think there is very little to be made from that. EPA had promulgated a rule covering a number of topics under the Clean Water Act, and Congress withheld funding for the implementation of that rule for one year before EPA withdrew it. So that's not a clear congressional statement that the rule was invalid or was contrary to its intent, and it's certainly not a clear congressional statement specifically on the question of reasonable assurances, which was only one part of that proposed rule. Instead, I think the Court is looking at what Congress did in the year 2000. It should look at Section 117G, which strengthens the existing Section 117, which had already established the Chesapeake Bay Program Office within EPA. And it strengthened EPA's authority by explicitly putting EPA at the head of the efforts that the states and the Chesapeake Bay Partnership were currently in the middle of to restore bay water quality. In fact, Congress then strengthened EPA's authority by including specific language that EPA should ensure that management plans are developed and that implementation has begun. If the plaintiffs here are looking for an explicit delegation of authority to ensure that state management plans will be implemented, there it is, right in Section 117G. And the reason that Congress did that was because it had seen decades of efforts by the states to do this on their own. The states had already established a total number and were failing to come up with the coordination among themselves to reach allocations, to impose controls. One problem was that they didn't all know what each other were doing, and they had no assurance that if they made the hard policy choices necessary to control pollution, that the other states would also do their part to reach an effective solution. Section 117G was about institutionalizing this process and putting EPA at the head of it so that plans would be developed and implementation would be begun. That's what the Bay TMDL represents, and the Court should uphold it on that basis as a reasonable exercise of EPA's authority. Thank you. Do you three gentlemen each of you have something separate to say, or is it pretty much the same? If it's pretty much the same, maybe we'll have you all up together, and then you can come in as you wish. We'll give you six minutes. If you want to do something separate, two minutes isn't a whole lot of time. You decide how you want to do it. Your Honor, my understanding is that the points are somewhat separate. Okay, let's do it separately then. It's fine. Mr. Pomeroy. May it please the Court. My name is Chris Pomeroy, and I represent the Intervenors Virginia and Maryland Associations of Municipal Wastewater Agencies and the National Association of Clean Water Agencies, and have only two minutes. These municipal associations serve literally millions of people in the Chesapeake Bay watershed by providing advanced wastewater treatment at their facilities that are regulated under the waste load allocations that are calculated and aggregated as part of the total maximum daily load. And even as heavily regulated entities in this undertaking that are now investing billions of dollars on treatment plant upgrades, we are here to respectfully ask this Court to uphold the TMDL. The municipal associations in particular support what we call the holistic watershed approach embodied by Congress in Section 303B. And we have done that consistently since the Chesapeake 2000 agreement, which was an undertaking we began 15 years after the 1985 rulemaking that got into the particulars, and 13 years after Congress amended the statute in 1987 where it in fact discussed waste load allocations. How much progress has been made since 1985? A substantial amount of progress across all sectors. I can speak to the point source sector where the progress has been approximately a 40 percent reduction in ferries by nitrogen and phosphorus. That was before the latest round of reductions associated with the lead-up to and recent implementation of the Bay TMDL in 2010. Okay. Our main point is that without the TMDL's allocation process, we really would be left in an unworkable process. As the district judge put it, leaving us to duke it out permit by permit to understand what each facility's capital-intensive facility, high-dollar investment by the public through the ratepayer funding mechanism, and these facilities with no process for sorting out what our slice of the pie for a given facility would be. So we've come to view that process as just absolutely essential to making the Clean Water Act work. You mentioned since 1985 there's been a 40 percent reduction on point sources. What about non-point sources? I believe it's comparable and would, in fact, complement our friends in the agricultural industry, in particular on substantial reductions as well, Your Honor. Okay. Thank you. Anything further you want to say? No. I will close there. I would just note on the deadline issue, if I may, that we would share the concern. Is it a deadline or a target date? It is a target date in our view, and we take EPA at its representation. Okay. Thank you. Thank you. Mr. Hahn. Good afternoon, Your Honors. My name is Stephen Hahn, and I represent the Pennsylvania Municipal Authorities Association. And my association represents the interests of over 700 municipal authorities in Pennsylvania, and part of our mission is to protect and enhance the environment and also to promote economic viability and vitality in Pennsylvania. One of the themes in the appellant's argument, both in the brief and what I heard today, is the EPA taking ultimate control over the states. Now, here in Pennsylvania, that's simply not true. Several years before the Bay TMDL was even established, my client, the Municipal Authorities Association, and the Pennsylvania Department of Environmental Protection, embarked on a cooperative venture in the form of a point source work group to address the nutrient discharges from over 180 significant wastewater treatment plants in Pennsylvania. The work group started with DEP's existing strategy, and after many months of meetings and discussions, the work group proposed a change to that strategy, and that strategy was later approved by management at DEP. That strategy was later incorporated into Pennsylvania's watershed implementation plan, which was later then incorporated into the Bay TMDL. DEP itself said that with respect to the wastewater treatment plants, this strategy is the most cost-effective and reasonable approach, and this was PMAA, representing the interest of the wastewater treatment plants, and DEP, not EPA. So appellants claim in their brief on page 12 that EPA has claimed the last word on how much nitrogen and phosphorus can come from a particular wastewater treatment plant in Pennsylvania. That's factually untrue, and it's not supported by the record. It was DEP which stated that it, DEP, ultimately adopted this allocation and permitting strategy. One final point. To disregard the allocations in the Bay TMDL, as the appellants seem to request, would mask the individual contributions from each source sector and the corresponding reductions needed from each sector to resolve the health of the Bay. The municipal wastewater treatment plants here in Pennsylvania and elsewhere have stepped up to the plate and have done their fair share and this was established in the TMDL. To now foist additional reductions upon them, having done their fair share, would be patently unfair. So PMAA opposes any more stringent discharge limitations on its members, irrespective of how such limitations may come about in the context of the Bay TMDL, and respectfully requests that this court affirm the decision of the district court and uphold the TMDL. Thank you very much. Thank you, sir. Mr. Mueller. Good afternoon, Your Honors. John Mueller for the Chesapeake Bay Foundation Group of Interveners. The Bay TMDL must be upheld because the Bay's poor health is caused by not just one state, but several states. CBF runs an education program. We take school kids out onto the Bay so that they can learn firsthand about its ecology and to teach them how what happens on the land affects bay water quality and its wildlife. Several of our educators are former watermen, a unique waterborne farmer of the Bay. Last month, we lost one of these men, Charles Parks of Tangier Island, Virginia. For 27 years, Charles would rise before dawn and head out onto the Bay in search of crabs, fish, and oysters. Driven from a way of life he loved, not because the sun was too hot or the wind too biting, but because poor water quality killed the underwater grasses essential for juvenile crabs and fish and smothered the oysters, making harvesting the Bay's bounty unprofitable. Now, isn't the crab population coming back in the Bay? Unfortunately, it's not. There has been some problems with the crabs. There are additional regulations that are being imposed on crabs, and part of the problem that we see is why water clarity, for example, may be increasing in some parts. The natural resources are not recovering. I thought until this past year, which had a bad winter, that the crab population was making significant gains in a comeback. It was up until that point. But now we have a downturn, and they're now looking at imposing additional requirements on crabbing. And what about oysters? Once upon a time, before I ever came to these parts, it was a huge industry. Absolutely. And the oyster population is now down to one, two percent. A lot of that's been driven by disease, but also when you have poor water quality, the oysters cannot survive. They get smothered by too much sediment that's run off from land. Okay. And watermen like Charles rely on clean water for their livelihood, but they cannot control the pollution from, say, Cooperstown, New York, that flows down the Susquehanna River, and are totally dependent upon EPA to take action. For almost 50 years, the interveners have worked and even sued EPA to follow Congress' mandate to make the bay fishable and swimmable. We have seen three times how voluntary state agreements have failed. Recognizing their failure, the states asked EPA to develop the TMDL, because it is the only entity that can require upstream states to reduce their pollution. For the interveners and all those who depend upon the bay for their livelihood, the TMDL represents the moment in time. For if it is struck down, the bay will not be restored. We ask for affirmance of Judge Rambo's decision. All right. Thank you very much. Mr. Schwartz. I'd like to address some of the questions that you've asked previously. And one is about the meaning of the word total. One sort of simple way to look at it is if you have an equation 2 plus 3 plus 1 equals 6, we would say the total is 6. The total isn't 2 plus 3 plus 1. We think that's the way it's commonly referred to. But what they're saying is that it's 2 plus 3 plus 1 because you have to look to all of those. You're aggregating all of those constituent parts. And when you say maximum daily load, if you say 6 and you add the word total, in order not to make total superfluous, doesn't it have to be 2 plus 3 plus 1? I think what it acknowledges is the fact that there are a lot of different sources for what goes into that load. And EPA is supposed to assume that all of them are coming in. In other words, it's not just looking for the total for point sources or non-point sources or paper plants. It's the whole thing. How much can the water tolerate and still meet the water quality standard? And that's the number. And then after you get that number, it could come from a lot of different places. And that, we believe, is what follows. What about Mr. Gunther's point that TMDL is not defined in the statute, therefore it needs to be defined in the regulation. And in that process, the EPA gets Chevron deference. I think the answer is that although it's not expressly defined in the statute, it's using common English words. And none of those words relate to allocations, deadlines, or assurance. Nor is it prohibited, though. No, there's no express prohibition. But the courts have generally said Congress can't sort of list everything that's not delegated. That's just not practical for statutory interpretation. And the other aspect of this is if there's an ambiguity, then the theory is that if there are gaps in the statute, then the agency can fill the gaps. And the point we're making is there are no gaps here. Because if you look at 319, for example, section 319 requires the states to develop best management practices for each category of non-point sources or specific non-point sources. And in the non-point source world, those are allocations. The way you allocate, you can't measure the amount going in. So the best management practices are the allocations. Then, again, in section 319, the next step for the plans is to identify programs. If you're saying these allocations can only be done how? As a practical matter, it's through imposing best management practices. Imposing best management practices? Let me just clarify that. In a sense, you're imposing best management practices, and from that you calculate how much will get into the water. But in terms of actually implementing those limitations on what gets into the water, for example, for a forester, you might not be able to cut down trees. For a farmer, you might have to impose a buffer zone. Who sets those best management practices? Those are set by the states. And, in fact, the states have set them. And the question is how much more, if anything, must be done in order to get down to the discharge level that is necessary to meet the water quality standards. The question I ask Mr. Gunther is, let's say you have seven states or six states in the District of Columbia, and you have two or three of them that refuse to cooperate. What happens then? Well, there are a couple of things. One is that the statute requires the states to put TMDLs into a Section 303e plan. And so the statute requires that the states will do that, and I think courts generally presume that people obey the law, and I think that's the better assumption to go with. If, for some reason, the states didn't obey the law, the sanctions would include, in the case of the 303e plan, EPA would not be allowed to approve the National Discharge Pollution Elimination System permits, the direct discharge permits that the programs of the states actually have. And so the EPA would be taking that away, in addition to the right to take away grant funding. And so, again, to me the contrary point is that the Congress required the states to include the TMDLs in the state umbrella plans for water quality control. I think the presumption should be that they will do what the law requires. Thank you very much. Okay. And thank you for all counsel for well-presented arguments. I'd like to have, if we could, a transcript prepared of this oral argument and split it evenly between the EPA and your side and leave the other folks out of this. That's fine. Thank you, Your Honor. Thank you very much. We're going to confer with Judge Roth shortly after. We'll take a five-minute break, and we'd ask that the courtroom be cleared, and then Judge Rick and I will come back, Jane, within five minutes. Okay. Very good. Thank you.